UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEVEN JOHN WILCOX,

                    Plaintiff,                           Case No. 2:20-cv-183

v.                                                       Honorable Hala Y. Jarbou

J. LANCOUR, et al.,

                    Defendants.

_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.
Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the
Court is required to dismiss any prisoner action brought under federal law if the complaint is
frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary
relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C.
§ 1997e(c).   The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*,
404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly
irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these
standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

### Discussion

#### I.     Factual allegations

Plaintiff presently is incarcerated with the Michigan Department of Corrections
(MDOC) at the Alger Correctional Facility (LMF) in Munising, Alger County, Michigan.  The
events about which he complains occurred at that facility.  Plaintiff sues the following LMF

officials:  Grievance Coordinator J. Lancour; Deputy Warden Scott Sprader; Assistant Deputy Wardens Gregory Schram and Benny Mercier; Correctional Officers John Does ##1 and 2 (Unknown Part(y)(ies) #1); and National Guard Officers Jane Roes ##1 and 2 (Unknown Part(y)(ies) 2).

Plaintiff alleges that, on May 6, 2020, he was confined in segregation at LMF.  At least four individuals wearing face masks, face shields, and gowns appeared at his cell window. Defendant Unknown Part(y)(ies) #1 (John Doe #1) ordered Plaintiff to back up to the food slot with his hands behind his back, so that he could be handcuffed.  Plaintiff complied.  The cell door was opened, and Defendant Schram ordered Plaintiff to step out of his cell and put his back against the hallway wall.

After Plaintiff complied, Jane Roe #1, believed to be a Michigan National Guard member, ordered Plaintiff to tilt back his head.  Jane Roe #2 then inserted a swab into Plaintiff's nostril, allegedly hitting Plaintiff's nasal-pharangeal passage, causing Plaintiff to gag and his eyes to burn and water.  Plaintiff complains that he did not consent to the test and would not have consented to it if asked.  Although Plaintiff acknowledges that he was not physically forced to submit to the test, he alleges that he was coerced because any failure to comply would subject him to disciplinary action and/or the use of force.  Plaintiff allegedly suffered for weeks from bloody nasal discharge, headaches, dizziness, blurred vision, vomiting, and painful nasal passages.

On the date of the nasal swabbing, Plaintiff sent a kite to Defendants Sprader and Mercier, complaining about the incident and demanding that video of the incident be retained for future investigation and litigation.  He received no response.  On May 11, 2020, he wrote a grievance on the issue and sent it to Defendant Lancour.  Lancour rejected the grievance as a challenge to MDOC Director's Office Memorandum (DOM) 2020-30R, which is non-grievable.

Defendant Sprader approved the rejection.  Plaintiff alleges that Defendant Sprader had actual knowledge that Defendant Lancour had a pattern and practice of rejecting grievances or refusing to process them.  He asserts that Defendants violated both prison policy and due process.

Plaintiff asserts that Defendants Sprader, Schram, and Mercier knew that the COVID-19 testing protocol did not comply with MDOC Policy Directive 03.04.105, which requires consent for medical procedures, and that they violated that policy by forcing him to submit to testing.  Plaintiff also complains that, by requiring him to be tested, Defendants have demonstrated deliberate indifference to his right to refuse medical care.  He also asserts that Defendants' conduct violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Plaintiff's next series of allegations is general and sweeping.  He contends that LMF policies allow the spoliation of evidence and otherwise deprive him of due process and his right to access the courts.  He also alleges that, as a segregation prisoner, he is not allowed to access state and federal case law and other research materials necessary to allow him to prosecute other actions he has filed, ostensibly in violation of his right to access to the courts.  In addition, he broadly states that, since filing his grievance on May 11, 2020, he has

> been subject to numerous and repeated acts of intimidation and reprisals at the hands of the defendants, their agents and subordinates, including but not limited to, verbal and mental abuse, harassment and ridicule, the denial of basic hyg[i]enic necessities, outdoor exercise, denials of photocopy services, legal writer services, the destruction of my personal property and impeding and obstructing my access to the U.S. mail.

(Compl., ECF No. 1, PageID.8.)  Plaintiff contends that Defendants are liable for the alleged retaliation because such retaliation is foreseeable.

Plaintiff seeks declaratory relief, together with compensatory and punitive damages.

**II.     Failure to state a claim**

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

**III.    Access to the Courts**

Plaintiff alleges that, by rejecting his grievances, Defendants Lancour and Sprader prevented him from exhausting his grievances and thereby interfered with his right to access the courts.  He also alleges that Defendant's failures to provide legal research and copying and failure to retain evidence violate his right to access the courts.

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners.  *Id.* at 817.  The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them."  *Id.* at 824-25.  The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts.  *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit.  In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim.  *Lewis*, 518 U.S. at 351-53; *see also Pilgrim v. Littlefield*, 92 F.3d 413,

416 (6th Cir. 1996).  The Supreme Court has strictly limited the types of cases for which there may

be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> litigating engines capable of filing everything from shareholder derivative actions
> to slip-and-fall claims.  The tools it requires to be provided are those that the
> inmates need in order to attack their sentences, directly or collaterally, and in order
> to challenge the conditions of their confinement.  Impairment of any other litigating
> capacity is simply one of the incidental (and perfectly constitutional) consequences
> of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals,

habeas corpus applications, and civil rights claims only."  *Thaddeus-X v. Blatter*, 175 F.3d 378,

391 (6th Cir. 1999) (en banc).  Moreover, the underlying action must have asserted a non-frivolous

claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis*

changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of

action . . . is an element that must be described in the complaint, just as much as allegations must

describe the official acts frustrating the litigation."  *Christopher v. Harbury*, 536 U.S. 403, 415

(2002) (citing *Lewis*, 518 U.S. at 353 & n.3).  "Like any other element of an access claim, the

underlying cause of action and its lost remedy must be addressed by allegations in the complaint

sufficient to give fair notice to a defendant."  *Id.* at 416.

To the extent that Plaintiff complains about Defendants' handling of his grievances,

he fails to state an access-to-the-courts claim.  Even if Plaintiff was improperly prevented from

filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by

filing a lawsuit) cannot be compromised by his inability to file institutional grievances.  *See, e.g.*,

*Lewis*, 518 U.S. at 355 (requiring actual injury); *Bounds*, 430 U.S. at 821–24.  The exhaustion

requirement only mandates exhaustion of available administrative remedies.  *See* 42 U.S.C.

§ 1997e(a).  If Plaintiff were improperly denied access to the grievance process, the process would

6

be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470 (6th Cir. 2001). In light of the foregoing, the Court finds that Plaintiff fails to state a cognizable claim that he was denied his right to access the courts with respect to the rejection or interference with his grievances.

With respect to Plaintiff's sweeping claims that he was denied access to legal research, a legal writer, copying services, and the preservation of evidence, his access-to-the-courts claim is wholly conclusory.  As discussed, conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.  Plaintiff fails to allege facts suggesting that any listed deprivation actually hindered or is hindering any litigation—much less nonfrivolous litigation of the types protected by the right to access the courts.  He also fails to allege facts indicating that the individual Defendants were responsible for any alleged deprivation.  Plaintiff therefore fails to state an access-to-the-courts claim.

## IV.    Retaliation

Plaintiff makes sweeping allegations that he has been subjected to a lengthy series of negative actions in retaliation for having filed a grievance against Defendants Unknown Part(y)(ies) ##1 and 2 on May 11, 2020.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a

7

plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith*, 250 F.3d at 1037; *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The Court will assume without deciding that Plaintiff's grievance was nonfrivolous.

The Court also will accept for purposes of this opinion that at least some of the actions alleged—the denial of basic hyg[i]enic necessities, outdoor exercise, denials of photocopy services and legal writer services, the destruction of personal property, and impeding mail—could, under appropriate circumstances, rise to the level of adverse action.

Plaintiff's claim fails, however, on the third prong of the retaliation claim, because it is wholly conclusory. It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, although temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive,'" *Muhammad v. Close*, 379 F.3d 413,

417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)), "conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004).

Plaintiff merely alleges the ultimate fact of retaliation in this action. He has not presented any facts to support his conclusion that any Defendant retaliated against him because he filed a grievance. Plaintiff alleges nothing more than that he filed a grievance in May and that he experienced unpleasantness on an unspecified number of occasions by unspecified individuals over the several months following the filing of the grievance. Such conclusory allegations fall far short of demonstrating the third prong of his retaliation claim.

## V.    Eighth Amendment

Plaintiff asserts that Defendants Jane Roes ##1 and 2 subjected him to nonconsensual COVID-19 testing and that Defendants John Does ##1 and 2 assisted in that testing. Plaintiff contends that these Defendants violated his rights under prison policy and the Eighth Amendment by acting with deliberate indifference to his right to refuse medical care. He alleges that, as a result of the test, he suffered bloody nasal discharge, headaches, dizziness, blurred vision, vomiting, and painful nasal passages for weeks.

To the extent that Plaintiff alleges that Defendants violated one or more prison policies, he fails to state a cognizable federal claim. Defendants' alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest).

Section 1983 is addressed to remedying violations of federal law, not state law.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.  Thus, alleged violations of prison policy governing grievances and rights to deny medical services do not state a cognizable § 1983 claim.

To the extent that Plaintiff alleges an Eighth Amendment violation, his allegations also fall short.  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d 474, 479-80

10

(6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).  The deliberate-indifference standard includes both objective and subjective components.  *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37.  To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety."  *Id.* at 837.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  *Id.* at 836.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844.

Here, Plaintiff alleges nothing more than that he was subjected to a deep-nasal swabbing to test for a highly contagious disease.  Nothing about his allegations suggest that he faced an substantial risk of serious harm from the performance of the test.  *Farmer*, 511 U.S. at 834.  His allegations therefore fail to demonstrate the objective prong of the deliberate-indifference standard.  *Cf. Hasenmeier-McCarthy v. Rose*, 986 F. Supp. 464, 471 (S.D. Ohio 1998) (holding that forcible administration of tuberculosis test does not violate the Eighth Amendment unless done in a malicious or sadistic fashion with knowing willingness to harm the plaintiff).

Moreover, even if he could show that he faced a substantial risk of serious harm from the test, Plaintiff fails to allege facts suggesting that Jane Does ##1 and 2 acted with the requisite deliberate indifference to that risk or acted "maliciously and sadistically to cause harm."

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  At best, Plaintiff alleges nothing more than that the swabbing was performed in a negligent fashion.   Allegations of negligence fall short of the deliberate indifference required to state an Eighth Amendment claim.  *See Farmer*, 511 U.S. at 835 (holding that an Eighth Amendment violation requires a "state of mind more blameworthy than negligence").  Moreover, the mere fact that Plaintiff suffered some unpleasant side effects from the test does not change this conclusion.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment").

Because Plaintiff fails to allege facts that support either prong of the deliberate-indifference test, his allegations fail to state an Eighth Amendment claim.

## VI.   Due Process

Plaintiff contends that Defendants Lancour and Sprader violated prison policy when they failed to process his grievance and failed to allow him to refuse medical treatment. Plaintiff also generally alleges that Defendants' practice of allowing the spoliation of evidence violated his right to due process.  Finally, Plaintiff asserts that he was subjected to involuntary medical testing without due process of law.

### A.      Violation of Prison Policy

As earlier discussed, to the extent that Plaintiff alleges a violation of prison policy, he fails to state a claim under § 1983.  Defendants' alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation.  *See, e.g., Laney*, 501 F.3d at 581 n.2; *Brody*, 250 F.3d at 437.

### B.      Denial or Rejection of Grievances

Plaintiff's allegation that Defendants Lancour and Sprader denied him due process by rejecting his prison grievance fails to state a due process claim.  Plaintiff has no due process

right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

### C.     **Spoliation of Evidence**

To the extent that Plaintiff contends that Defendants violated his right to due process by allowing the routine spoliation of evidence, he fails to state a claim.  Plaintiff's allegations concerning Defendants' general practice of allowing the spoliation of evidence are wholly conclusory.  He does not allege any specifics about the deprivations he personally has suffered, much less allege facts showing that those deprivations impose an atypical and significant hardship.  Instead, his allegations are wholly conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555.

### D.     **Medical Testing**

Plaintiff claims that Defendants Jane Roes ##1 and 2, assisted by Defendants John Does ##1 and 2, violated his due process rights when they inserted a swab deep into his nasal passage to test him for COVID-19.

13

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . . ." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). This liberty interest survives conviction and incarceration. *Washington v. Harper*, 494 U.S. 210, 221 (1990) (recognizing an individual's liberty interest in avoiding the unwanted medical treatment)

In *Harper,* 494 U.S. 210, the Supreme Court established the analysis for due process claims based on the forced administration of medical treatment to prisoners.  The *Harper* Court recognized that a prisoner had a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs . . . ." *Id.* at 221.  The Court held, however, that "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" *Id.* at 223 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).  *See also McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (applying *Turner* test to mandatory tuberculosis treatment).

Under *Turner*, to determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors:  (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Turner*, 482 U.S. at 89-90.  Moreover, in evaluating

14

whether a prisoner's constitutional rights have been violated, courts routinely accord great deference to prison officials' assessments of their interests.   *Id.* at 84-85 ("Prison administration . . . is . . . a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint." *Id.* at 85; *see also Harper*, 494 U.S. at 224 (1990); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125–126 (1977).  The need for deference is even stronger where, as here, a state penal system is involved, due to concerns with comity that are inherent in our federal system. *Id.* (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

Applying the first prong of the *Turner* test, the *Harper* Court held that there existed little doubt that about "the legitimacy and the importance of the governmental interest . . . in combating the danger posed by a person to both himself and others"—a danger that is "greater . . . in the prison environment . . . ." *Harper*, 494 U.S. at 225.  The Court noted that the state had

> the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution.  Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, *see Hewitt,* 459 U.S., at 473, but also the duty to take reasonable measures for the prisoners' own safety.

*Harper*, 494 U.S. at 225 (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  Indeed, even outside the prison context, the Supreme Court has upheld as constitutional a statute requiring all adults to receive a smallpox vaccination, due to the legitimate governmental interest in preventing the spread of smallpox, a highly contagious and deadly disease.  *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), *cited in McCormick*, 105 F.3d at 1061.

As in *Harper*, there can be little doubt that Defendants in the instant case had a legitimate penological purpose in testing the prison population for the SARS-CoV-2 virus.  In the

context of an Eighth Amendment challenge to precautions taken by a federal prison in the face of the COVID-19 pandemic, the Sixth Circuit has held that COVID-19 poses a substantial risk of serious harm to prison inmates, given the substantial risk of contagion to those housed in close-contact situations, such as prisons, as well as the serious risks to health and life when the disease is contracted.  *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (recognizing the seriousness of both the transmissibility of COVID-19 in the prison setting and the health risks to individuals who contract the disease).[1]  Under these circumstances, Defendants had a legitimate—indeed compelling—governmental interest in testing all prisoners for the presence of the SARS-CoV-2 virus, in order to meet its obligations to control contagion and to protect its other prisoners and staff.  *See Jolly v. Courghlin*, 76 F.3d 468, 477 (2d Cir. 1996) (holding that a prison had a compelling state interest in mandatory tuberculosis testing); *Dunn v White*, 880 F.2d 1188, 1195 (10th Cir. 1989) (holding that a prison had a legitimate penological interest in ascertaining the extent of contagion that justified coercive blood testing for AIDS); *Wilson v. Wilkinson*, 608 F. Supp. 2d 891 (S.D. Ohio 2007) (upholding state statute requiring mandatory DNA testing of prisoners against Fourth Amendment challenge); *see also McDougald v. Stone*, No. 1:17-cv-72, 2017 WL 8222430, at *5 (S.D. Ohio Aug. 22, 2017) (finding legitimate penological interest in mandatory blood-draw of prisoner who spit on officer).  The first prong of *Turner* therefore unquestionably is met.

> The second factor—whether there remain means of exercising the constitutional right—is inapplicable to the analysis of a due process claim for unwanted medical testing and

---

[1] The contagiousness and seriousness of COVID-19 is dramatically evidenced by the fact that 23,748 of the 40,225 prisoners incarcerated with the MDOC have contracted the disease, and, of those, 127 prisoners have died.  A total of 3,294 staff members have tested positive for the illness, and 4 have died.  *See MDOC Response and Information on coronavirus (COVID-19)*, https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337 (visited Jan. 20, 2021).

treatment.  *See Harper*, 494 U.S. at 224 (recognizing that the second *Turner* factor is not relevant in evaluating a prisoner's due process claim for unwanted medical treatment).

With respect to the third factor—the impact of accommodating Plaintiff's right under these circumstances would impose on the rights of other inmates and prison personnel—falls squarely in favor of Defendants.  In *Harper*, the Supreme Court concluded that the accommodation of Plaintiff's interest in not being medicated for his mental disability could not be accommodated while meeting the legitimate and compelling needs of the prison to protect all prisoners and staff.  *Id.* at 225.  Here, accommodating Plaintiff's desire to be excused from a minimally intrusive nasal-swab test would prevent Defendants from meeting their need to identify COVID-19-positive prisoners and to isolate them.  Plaintiff's demand to be excluded from testing would undermine the efficacy of the testing protocol, pose increased risks to Plaintiff and others, and prevent the prison from meeting its Eighth Amendment obligations to all prisoners.

For the same reasons, no ready alternatives exist that would fully accommodate the prisoner's rights at de minimis cost to valid penological interests.  *Turner*, 482 U.S. at 89-90.  Plaintiff's claim, therefore, also fails on the fourth *Turner* factor.

Because Plaintiff's allegations fail to meet all three of the relevant prongs of the *Turner* test, he fails to state a due process claim.

**VII.   Fourth Amendment**

Plaintiff claims that Defendants Jane Roes ##1 and 2, assisted by Defendants John Does ##1 and 2, subjected him to an unreasonable search and seizure when they inserted a swab deep into his nasal passage to test him for COVID-19.

The Fourth Amendment to the United States Constitution protects individuals "against unreasonable searches and seizures."  U.S. Const. Amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643 (1961) (holding that the Fourth Amendment is applicable to the states under the Due

Process Clause of the Fourteenth Amendment).  Forcing an individual to subject himself to a physically invasive medical test may implicate Fourth Amendment concerns, but determining what is "reasonable" within the boundaries of the Fourth Amendment requires context.  *See Schmerber v. State of California*, 384 U.S. 757, 759–60 (1966) (holding that forced blood draw from a detainee arrested for driving under the influence did not violate the Fourth Amendment where there was ample evidence that the detainee was under the influence).

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court considered a variety of challenges to federal prison conditions, including a Fourth Amendment challenge to the constitutionality of suspicionless strip searches that included a visual body-cavity examination. The Court held that, assuming that prisoners retain some Fourth Amendment rights, the reasonableness of a prison search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Id.* at 559.

As previously discussed, in *Turner*, 482 U.S. 78, issued several years after *Bell*, the Supreme Court established a four-factor test for determining when prison regulations impinge on prisoner constitutional rights:  (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.  *Turner*, 482 U.S. at 89-90.

Some courts have questioned whether the test in *Turner*, which purports to apply to all questions involving constitutional claims by prisoners, overrides the specific Fourth Amendment balancing test set forth in *Bell*, 441 U.S. 520.  *See Florence v. Bd. of Chosen*

18

*Freeholders of Cnty. of Burlington*, 621 F.3d 296, 306 n.5 (3d Cir. 2010) (holding that, in light of the Supreme Court's repeated admonitions that courts not assume that it has overturned its own precedents, the *Bell* standard remains applicable, without the overlay of *Turner*); *Powell v. Barrett*, 541 F.3d 1298, 1302 (11th Cir. 2008) (same).  Other courts, however, conclude that Fourth Amendment claims are properly analyzed under *Turner*.  *See Sinclair v. Stalder*, 78 F. App'x 987, 989 (5th Cir. 2003) (applying the test set forth in *Turner*, 482 U.S. 78, to analyze the plaintiff's First and Fourth Amendment claims); *United States v. Workman*, 80 F.3d 688, 698-99 (2d Cir. 1996) (same).  In *Harper*, 494 U.S. 210, the Supreme Court expressly stated that "*Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."  *Id.* at 224 (applying *Turner* to a due process claim involving forced administration of antipsychotic drugs).  Yet, in *Johnson v. California*, 543 U.S. 499, 510-11 (2005), the Supreme Court narrowed *Harper*'s statement, holding that "*Turner*'s reasonable-relationship test [applies] *only* to rights that are 'inconsistent with proper incarceration,'" holding that equal protection rights are not subject to *Turner* review, because they are not inconsistent with incarceration, and recognizing that Eighth Amendment rights also are not subject to *Turner* analysis) (emphasis in original) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003)).

Plaintiff's Fourth Amendment challenge appears to raise the type of "circumstance[] in which the needs of prison administration implicate constitutional rights" discussed in *Harper*, 494 U.S. 210.  Indeed, as the Supreme court has recognized, Fourth Amendment rights are among the rights that are most limited by incarceration.  *See Bell*, 441 U.S. at 558.  Arguably, then, *Turner* should be viewed as an overlay to *Bell* that modifies, but does not eviscerate, the balancing considerations of *Bell*.  The Court, however, need not decide the issue, as Plaintiff's claim fails under both *Turner* and *Bell*.

19

A. ***Turner* analysis**

In analyzing Plaintiff's due process claim, the Court already has applied the *Turner* test to the circumstances alleged.  The first prong of that test is no different when considered in the context of a Fourth Amendment claim.  As earlier discussed, there can be little doubt that the MDOC had and has a legitimate penological interest in testing inmates as part of its measures to control the contagion.  *See Jolly*, 76 F.3d at 477 (finding a legitimate penological interest in mandatory tuberculosis testing); *Dunn*, 880 F.2d at 1195 (legitimate interest in mandatory blood draw to test for AIDS); *Wilson*, 608 F. Supp. 2d 891 (legitimate interest in mandatory DNA testing of prisoners); *see also McDougald*, 2017 WL 8222430, at *4-5 (legitimate interest in mandatory blood-draw from prisoner accused of spitting on officer).

Moreover, in the Fourth Amendment context, as in the due process context, various courts have recognized that *Turner*'s second factor is not generally applicable:

> Not all four factors will be relevant to each case.  For example, the second Turner factor—availability of other avenues for exercising the right infringed upon—is much more meaningful in the [F]irst [A]mendment context than the [F]ourth or [E]ighth, where the right is to be free from a particular wrong.

*Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988) (applying *Turner* to analysis of Fourth Amendment claim), *cited in Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997); *see also Harper*, 494 U.S. at 224 (recognizing that only three of the four *Turner* factors—not including the second factor—were relevant in evaluating a prisoner's due process claim).  Regardless, even if the second factor has some bearing, the Court's conclusion that the prison may intrude upon a prisoner's privacy for contagious-disease testing does not entirely eviscerate a prisoner's privacy interests.

Third, as earlier discussed, the impact of accommodating Plaintiff's right under the circumstances of this case would impose a substantial burden on the rights of other inmates and

prison personnel.  Defendants cannot meet their need to identify COVID-19-positive prisoners and to isolate them from unexposed prisoners without testing all prisoners.  Plaintiff's demand to be excluded from testing would undermine the efficacy of the testing protocol, pose increased risks to others, and prevent the prison from meeting its Eighth Amendment obligations to all prisoners.

Finally, Plaintiff does not identify and the Court cannot conceive of any ready alternative that would accommodate Plaintiff's rights at de minimis cost to valid penological interests.  *Turner*, 482 U.S. at 89-90.  Indeed, no other measure would permit the prison to control outbreaks of the deadly disease.

For these reasons, if the *Turner* test applies, Plaintiff's Fourth Amendment claim must be dismissed.

### B.    *Bell* Analysis

Even were the Court to apply the arguably more lenient standard of *Bell*, 441 U.S. 520, which "require[s] a balancing of the need for the particular search against the invasion of personal rights that the search entails[,]" *id.* at 558, Plaintiff's allegations would fall short.  Courts have recognized that prisoners have an extremely limited expectation of privacy under the Fourth Amendment.  *See Hudson*, 468 U.S. at 524–28 (recognizing that a prisoner has only a limited privacy interest under the Fourth Amendment); *Bell*, 441 U.S. at 558.  The Sixth Circuit has upheld against a Fourth Amendment challenge the nonconsensual taking of blood samples from prisoners, relying on an inmate's "sharply reduced expectation of privacy, and the minimal intrusion required in taking a blood sample for DNA analysis" for identification purposes.  *United States v. Conley*, 453 F.3d 674, 680 (6th Cir. 2006) (confirming the constitutionality of blood draws under the Federal DNA Act, 42 U.S.C. § 14135a).  Applying the *Bell* standard, other courts have upheld mandatory blood draws in prisons in furtherance of drug testing and to control the spread of communicable diseases.  *See Dunn*, 880 F.2d at 1195 (holding that a prison's substantial interest

21

ascertaining the extent of contagion constitutes a legitimate penological purpose that outweighed reduced privacy interest of prisoner, and justified coercive blood testing for AIDS); *Harris v. Thigpen*, 941 F.2d 1495, 1501 (11th Cir. 1991) (the testing and segregation of prisoners from AIDS constitutes a legitimate penological interest and survives review under *Turner*).  In addition, a number of courts have held that mandatory tuberculosis testing is reasonable under the Fourth Amendment.  *See Bowell v. Cal. Dep't of Corr.*, No. 2:17-cv-981, 2020 WL 4368087, at *5-6 (E.D. Cal. July 30, 2020) (holding that mandatory TB testing did not violate the constitution) (citing cases); *Mack v. Campbell*, No. 91-5181, 1991 WL 243569 (6th Cir. Nov. 21, 1991); *Hasenmeier-McCarthy v. Rose*, 986 F. Supp. 464 (S.D. Ohio 1998)  Further, courts have recognized that, in addition to having a substantial interest in assessing and controlling contagion, states have an affirmative duty to protect other inmates from infectious disease.  *Jolly*, 76 F.3d at 477 (citing cases).

The nasal swabbing about which Plaintiff complains appears even less intrusive than the blood draws discussed in the cited cases.  It arguably falls closer to the buccal swabbing to collect DNA, which the Supreme Court has upheld as reasonable under the Fourth Amendment, even for a person who has only been arrested, rather than convicted, and therefore has somewhat greater privacy expectations.  *See Maryland v. King*, 569 U.S. 435, 463 (2013) (balancing the law-enforcement-related concerns against the minimal intrusion on privacy).  Most certainly, the balancing of Plaintiff's limited Fourth Amendment interest against the significant governmental interest in controlling a pandemic weighs heavily in favor of permitting Defendants to subject Plaintiff to the limited intrusion of a deep nasal swab.

Under these authorities and applying *Bell*, the Court concludes that Plaintiff's Fourth Amendment claim fails to state a claim.

## VIII.   Pending Motions

Plaintiff has filed two motions that are currently pending before the Court.  The first, filed December 10, 2020, is a motion to show cause (ECF No. 9) why Defendants should not be held in contempt and for a temporary restraining order.  The second, filed December 22, 2020, is an emergency motion (ECF No. 13) seeking preservation of video evidence of Plaintiff's COVID-19 testing.  Because the Court concludes that Plaintiff's complaint fails to state a claim, Plaintiff's motions seeking preliminary relief will be denied as moot.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court does not certify that an appeal would not be taken in good faith.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   January 22, 2021                             /s/ Hala Y. Jarbou
                                                      HALA Y. JARBOU
                                                      UNITED STATES DISTRICT JUDGE